**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**YANA LEONOVA,**<br><br>**Defendant.** | **Case No. 24-CR-421 (LLA)** |

# <u>MEMORANDUM IN AID OF SENTENCING</u>

"There is no place like home"—

L. Frank Baum, The Wonderful Wizard of Oz (1900).

For most people, an airplane is simply a means of transportation—a way to travel from one place to another. For Yana Leonova, airplanes have always represented something far more profound: freedom, possibility, hope, and the promise of a better life.

Since childhood, Yana dreamed of flying airplanes. She loved learning about them, playing of being a pilot, dressing in a pilot uniform. To a little girl, the experience was magical. The imaginary airplane was carrying her toward a new life—one she fantasied would be happier, brighter, and filled with exciting possibilities.

She imagined that somewhere beyond the horizon lay a world of opportunity: a place where hard work, perseverance, and determination could transform her circumstances.

Yet the pursuit of that childhood dream led her not to the future she had imagined, but to a jail cell in a foreign country.

It has now been more than two years since Yana boarded the airplane for what she believed would be a two-weeklong birthday trip in Paris with the love of her life.

She has not returned home.

## A Childhood Dream of Flying

Ever since she was a child Yana dreamed of travelling. Her journey began at the age of ten when her mother told her that they are moving from Belarus to Kazakhstan. She vividly recalls packing the household items, boxes, bags, duffel bags. As a young girl, she had never traveled that far, and her heart raced with excitement and curiosity.

The reality awaiting her in Kazakhstan was far different. In her new cultural community, Yana was an outsider. The clothes she had worn freely as a child—short skirts and shorts—were no longer acceptable. She did not speak Kazakh, had no friends and struggled to adapt to an unfamiliar environment. Her classmates bullied her and played cruel tricks on her at school. The family's living conditions were harsh. The house had no running water. Electricity was frequently unavailable, and even preparing a meal could become a challenge. At times, Yana wondered whether she had somehow landed in the wrong place.

Yet the hardships of her childhood did not extinguish her optimism. Instead, they gave her a sense of purpose. She became fascinated with aviation, dressing as a pilot during children's performances and imagining herself one day taking flight. She believed that better places existed somewhere in the world. She simply had to study harder, work harder, and, someday, board another airplane that would carry her toward a better future.

And that is precisely what she set out to do.

**Perseverance, Education, and a Commitment to Helping Others**

Despite the challenges of her upbringing, Yana excelled academically. She graduated from high school with honors and earned admission to a reputable university in Kazakhstan. She was the first person in the family to obtain a college degree. Her achievements did not come easily. Beginning at the age of sixteen, Yana supported herself by working various hard labor jobs while continuing her education. She learned early that financial independence required discipline, sacrifice, and extraordinary perseverance.[1]

At the same time, Yana developed a commitment to helping women from rural communities who faced limited educational opportunities and significant barriers to employment.[2] Having experienced hardship and social isolation herself, she understood how profoundly a person's circumstances could restrict their opportunities. Through her community involvement, she sought to help other young women overcome those obstacles and pursue greater independence.[3]

Throughout these years, her childhood dream of aviation remained alive. She hoped to become a flight attendant, but medical limitations prevented her from enrolling in a flight school. She was disqualified because of her medical

[1] *See Exhibit 4,* Certificate in Computer Literacy; *Exhibit 5,* Certificate in Clothing Design.

[2] *See Exhibit 2*, Materials on Yana's participation in Vienna Ball event in 2012 to raise funds for a crisis center for women and children who had suffered from domestic violence or were facing severe life circumstances.

[3] *See Exhibit 3*, Materials related to Yana's attendance of MISK Shymkent School of Human Rights and School of Civic Education.

issues: myopia, back injuries and heart condition. For someone whose dreams had always centered on movement, freedom, and flight, the experience was especially difficult.

Nevertheless, Yana refused to abandon her aspirations. After graduating from university, she pursued employment in the airline industry as an office assistant. Finding professional opportunities commensurate with her ambitions proved difficult for Yana Leonova in Kazakhstan. The job prospects for women in Kazakhstan were limited.[4] Seeking better professional opportunities and higher compensation, she began applying for positions in Russia.

**Relocating to Russia**

In November 2021, Yana accepted a logistics manager position with North-West Airline, which operated charter aircraft in the civil aviation industry. Filled with excitement, she packed her bags and boarded an airplane destined for Russia in pursuit of a better life. The excitement she felt was remarkably similar to what she had experienced as a ten-year-old girl leaving Belarus. That flight to Russia brought back the sense of possibility she had associated with moving since her

---

[4] *See United Nations, Women's Anti-Discrimination Committee Begins Consideration of Kazakhstan's Initial Report* (Jan. 18, 2001), the United Nations reported that women accounted for approximately two-thirds of Kazakhstan's unemployed population and earned only 70 percent of men's wages, available at https://press.un.org/en/2001/wom1248.doc.htm.

childhood. She believed she was finally building the future for which she had worked so hard.

Life in Russia proved far more difficult than she had anticipated. Within months of her relocation, the country engaged in the most horrific war since the World War II, prompting sweeping Western sanctions that severely disrupted the Russian aviation industry; civil passenger airlines were scrambling to source spare parts to safely operate their aircraft fleet. Yana found herself alone in an enormous, unfamiliar city, without friends or family nearby, facing financial challenges associated with the move. Her mother, who had been a source of comfort and support throughout her life, was far away.

Her working environment was equally challenging. Her supervisor routinely intimidated young female employees, assigning overwhelming workloads and imposing deadlines that were nearly impossible to meet. Yana frequently remained at the office until well past midnight, struggling to complete her assignments. The stress and exhaustion took a toll on her health. She was diagnosed with thyroid dysfunction and developed other chronic medical conditions.

It was during this period that Yana met a young man associated with a business partner of her employer, a company involved in supplying aircraft parts. Yana was immediately attracted to him. He was handsome, charming, and approximately her age. They shared a connection through the aviation industry,

and what began as professional acquaintances developed into a personal relationship.

They spent months talking on the telephone, sharing details about their lives, aspirations, and hopes for the future. Eventually, they met for a romantic getaway. For a young woman living far from her family, struggling with an oppressive work environment, and longing for companionship, the relationship offered happiness and the possibility of building a life with someone she loved.

As her next birthday approached, the man identified in this case as Co-Conspirator A proposed that they celebrate together in Paris, France. For Yana, the invitation seemed like a dream come true. Paris, the city of romance, represented everything she had hoped for: love, happiness, and the possibility of a future shared with someone special. She applied for a tourist visa, purchased her airline ticket, and arranged for someone to care for her two beloved cats during her trip. She packed for what she expected would be a two-week vacation, some pretty dresses and jeans, a pair of new shoes that were hard to walk in but looked beautiful with one of her dresses, her purses. She booked the Paris sightseeing tours in advance. When she boarded the airplane and breathed in the unmistakable smell of an aircraft cabin, her heart once again filled up with excitement, affection, and hope.

Upon landing in Paris, Yana was arrested as she disembarked. Confused and terrified, she desperately attempted to contact the man she believed was waiting

for her. Her calls went unanswered. The person with whom she had shared her most intimate hopes and dreams had suddenly disappeared from her life. Instead of celebrating her birthday in Paris, Yana found herself alone in an airport police detention cell, surrounded by concrete walls and hard benches. Cold and frightened, she cried herself to sleep. She had no family nearby, no familiar face to comfort her, and little understanding of what would happen next.

The following day, she was transferred to a Paris jail to face extradition proceedings. The romantic trip she had anticipated had instead placed her in the custody of foreign authorities. What she believed was an invitation from a man she loved had led her into a law-enforcement operation to secure her presence outside Russia.[5] A trip intended to last two weeks has now continued for more than two years.

## A Sentence of Time Served Is Sufficient but Not Greater Than Necessary

The sentencing inquiry under 18 U.S.C. § 3553(a) requires the Court to consider not merely the offense, but also the history and characteristics of the person standing before it. Yana's history reflects a young woman who overcame substantial adversity, pursued education and employment, demonstrated compassion toward others, and sought to build an independent and productive life.

[5] There is no public record of criminal prosecution of Co-Conspirator A.

Her experiences since her arrest must likewise be considered. More than two years of jail and home incarceration with significant restrictions on her liberty have imposed substantial punishment. The time she spent in French jail, French home detention, in Alexandria Detention Center, and home incarceration in New Jersey has profoundly altered the course of her life.

Yana Leonova has accepted responsibility for her conduct. She has experienced firsthand the consequences of her actions and the extraordinary personal cost of engaging in criminal conduct. The prolonged deprivation of her freedom and separation from her family forever changed her life. The young girl who once believed that every airplane could carry her toward a better future has learned, in the most painful way the consequences of committing a crime.

Today, Yana Leonova no longer dreams of a glamorous destination, an exciting career opportunity, or a romantic birthday celebration in Paris. After more than two years of confinement and separation from her family, Yana asks for the opportunity to reclaim her life, reunite with those she loves, and pursue a different career.

For a young woman who has spent her entire life dreaming of airplanes and the possibilities they represent, the most meaningful journey now would be the simplest one.

**The journey home.**

For the following reasons, and in consideration of the nature and circumstances of the offense, Yana Leonova's history and characteristics, her acceptance of responsibility, and the sentencing factors set forth in 18 U.S.C. § 3553(a), the defense respectfully requests that the Court impose a sentence of time served.

## MEMORANDUM OF LAW

### I. ADVISORY GUIDELINES' OFFENCE LEVEL CALCULATION

On May 20, 2026, Yana Leonova pled guilty, pursuant to a plea agreement, to Count 3 in the Indictment, a violation of the Export Control Reform Act ("ECRA") in violation of 50 U.S.C. § 4819. The Government agreed to dismiss the remaining counts. Ms. Leonova's sentencing hearing is scheduled for October 28, 2026.

#### A. Base Offence Calculation

The Probation Office determined, and the Government did not object to the following offence level calculation:

(i) U.S.S.G. §2M5.1(a)(1) Base Offense Level 26

(ii) the defendant meets the criteria at USSG §§4C1.1(a)(1)-(11), and the offense level is reduced by two levels under USSG §§4C1.1(a) and (b);

(iii) the defendant has clearly demonstrated acceptance of responsibility for the offense, and the offense level is decreased by two levels under USSG §3E1.1(a).

(iv) the defendant timely notified authorities of the intention to enter a plea of guilty, and the offense level is decreased by one additional level under USSG §3E1.1(b).

## B. Minor Role Adjustment

Defendant respectfully submits that she is also eligible for the mitigating role adjustment under USSG §3B1.2(b), which provides for a two-point redaction for

> a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline. The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.

18 U.S.C.S. app. § 3B1.2. Application Note 3(C) to USSG § 3B1.2 states that in determining whether a defendant qualifies for a minor role adjustment, a district court should consider:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts.

In her employee role, Ms. Leonova is substantially less culpable than her co-conspirators: North-West Air Company, a Russian airline company,[6] the

[6] *See Exhibit 6, North-West Air Company website printout*, available at https://www.northwest.aero/en/

Armenian intermediary company, and the U.S. based supplier of the parts Co-Conspirator A.[7]

At all times she was a lower-level salaried employee – a logistics manager[8] hired from Kazakhstan in November 2021, approximately four months prior to imposition of Russia related sanctions. Unlike other participants, she was not receiving any profit from the sales of aircraft parts. She had no proprietary interest in the airline company that she worked for and no access to the airline company's finances.

Yana had no personal stake in bringing the aircraft parts to Russia. She had signed a long-term apartment lease and incurred financial obligations related to her relocation. Her employer placed her under intense pressure to continue performing her duties. At that time, the stress of the move and her mounting obligations caused her health to deteriorate.

After February 2022 the Russian aviation industry collapsed after the imposition of Western sanctions. Boeing and Airbus suspended the supply of aircraft components and technical support, effectively severing Russian airlines' access to essential maintenance services and replacement parts for much of their

---

[7] There is no public record of any criminal prosecution of Co-Conspirator A or any other co-conspirators.

[8] *See Exhibit 7, Advertisement of procurement manager position at North-West Air Company website*, available at https://www.northwest.aero/en/company/vacancy/ outlining the Ms. Leonova's job responsibilities.

existing fleets. Within weeks, Russian commercial carriers faced the prospect of grounding aircraft unless they could urgently identify alternative sources of spare parts necessary to maintain their airworthiness and ensure the safety of passengers and crews. [9] The aviation companies' management directed company employees to procure aircraft parts from alternative sources, third-world countries which did not impose sanctions. By June 2022, the International Civil Aviation Organization formally notified Russia of significant aviation safety concerns.[10]

Yana was unsophisticated and lacked independent judgement. She was raised in a culture where she was never expected to say "no" to a superior, where obedience at the workplace was expected. Yana did not design the scheme. She had no authority or discretion. She followed the orders of the company's top management and performed her job responsibilities in the changing political reality. All decisions-making authority was exercised by the Russian airline company and the U.S. based supplier.

Accordingly, the defense respectfully submits that Yana Leonova is eligible for the mitigating role adjustment under USSG §3B1.2(b), which provides for a

---

[9] *See Reuters — March 11, 2022: Russia Looking at Sourcing Aircraft Spare Parts from Asia*, https://finance.yahoo.com/news/1-russia-looking-sourcing-aircraft-122322033.html

[10] *See Report on Infractions of the International Civil Aviation by the Russian Federation*, The International Civil Aviation Organization, Assembly – 41 Session, available at https://www.icao.int/sites/default/files/Meetings/a41/Documents/WP/wp_430_en.pdf

two-point redaction requests, and that the total offence level computation is adjusted to level 19.

### C. Foreign Jail Time in France and Pretrial Detention at Alexandria Detention Facility

Pursuant to 18 U.S.C.S. § 3585 (b), a "defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences— (1) as a result of the offense for which the sentence was imposed..."

Yana Leonova was arrested in Paris, France, on September 1, 2024, and held until October 17, 2024 (46 days), at which time she was released to home detention. Following the extradition process, she surrendered into US custody on or about October 29, 2025, and was held until November 2, 2025 (5 days).

On November 3, 2025, she was extradited to the U.S., arrested and held without bond until December 18, 2025 (46 days), at which time she was released into the High Intensity Supervision Program (HISP), in which status she remains.

Yana Leonova respectfully requests the Court to consider for the sentence of time served or to issue recommendation to the Bureau of Prisons to credit the time served in the French jail awaiting extradition.

She further requests the Court to consider time on home detention in France (12 months, 13 days) and home incarceration time in New Jersey (11 months, 11

days) for a downward variance under 18 U.S.C. § 3553(a) factors for the reasons listed below.

## II. SENTENCING FACTORS

The Supreme Court in *United States v. Booker* declared that the Federal Sentencing Reform Act of 1984 made the federal sentencing guidelines "*advisory*," not binding on federal courts. *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added). Under *Booker*, the district courts only need to "consult th[e] Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). Courts must consider all of the factors set forth in 18 U.S.C. § 3553(a):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...
> (5) any pertinent policy statement—
> (A) issued by the Sentencing Commission ...
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

and
(7) the need to provide restitution to any victims of the offense.

The Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

## III. A DOWNWARD VARIANCE IS APPROPRIATE IN THIS CASE

For the following reasons, a sentence of time-served is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing.

### A. The Nature and Circumstances of the Offense

The Statement of Offense addresses the conduct, which led to the indictment in this case. In short, between November 2021 and May 2023 Yana Leonova worked as a logistics manager at North-West Air Company in Russia. The airline company engaged in civil aviation transportation. Prior to February 2022, the company purchased aircraft parts directly for a U.S. based supplier. After the imposition of Russia related sanctions, the company began purchasing the parts indirectly through Armenia. Co-conspirator A introduced an intermediary company in Armenia to facilitate those sales. Yana was a lower-level employee[11] communicating and meeting with the suppliers, placing the purchase orders to procure aircraft parts at the direction of the company's management.

### B. Ms. Leonova's History and Characteristics

Because the Sentencing Guidelines do not ordinarily take into account matters relating to the history and characteristics of the defendant such as age, education, employment history, family ties, medical condition, and the like, the

[11] [11] *See Exhibit 7, Advertisement of procurement manager position at North-West Air Company website*, available at https://www.northwest.aero/en/company/vacancy/ outlining the Ms. Leonova's job responsibilities.

sentencing court may do so in order to impose a just sentence that fulfills the purposes of § 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2473 (2007). The Court may disregard the Sentencing Guidelines based on a determination that they do not properly reflect the § 3553(a) factors, are based upon unsound judgment, or fail to address the individual characteristics of the defendant. *Id.* at 2468.

### 1. Family History

Yana Leonova was born in Belorussia. Her mother's family came from small villages in Moldavia. In the 1970s her grandmother worked as a cook in a traveling circus visiting many rural towns in the former Soviet Union. In 1985 the grandmother with two young daughters settled down in Belorussia where she found work as a janitor at an elementary school. At that time the Belorussian government provided accommodations to school personnel, and Yana's grandma, a single mother of two, hoped that she would finally have a place to live of her own. Yana still recalls helping her grandma sweep the school grounds when she lived in Belorussia in her early childhood years.

Yana's mother was only seventeen years old when Yana was born. She had to withdraw from high school after the ninth grade due to pregnancy and newborn care. As a young mother in the 1990s, Yana's mother went through very tough times providing sole financial support to her child and extended family living with them. She worked hard labor jobs to make ends meet. During Yana's early childhood years, her mother worked long hours as a cashier at a local grocery store.

The collapse of the Soviet Union plunged Belarus into a period of profound economic instability and widespread hardship. Throughout the early 1990s, the country experienced extraordinary inflation, collapsing wages, and rapidly deteriorating living standards. According to the International Monetary Fund, Belarus's economy contracted by approximately 36 percent between 1991 and 1994, while consumer price inflation reached 2,221 percent in 1994.[12] The World Bank documented the resulting erosion of household purchasing power and increasing poverty.[13] All savings that people had disappeared due to money devaluation.[14] For families raising children during this turbulent period, economic uncertainty was not an abstract national phenomenon but a reality affecting their ability to meet daily needs. Unemployment was widespread.

The economic instability increased rates of alcoholism, substance abuse and domestic violence. Rates of alcoholism in the former Soviet Union republics, and in particular use of home-made distilled spirits with alcohol content of 40 % or

---

[12] Report No. 15380-BY Belarus An Assessment of Poverty and Prospects for Improved Living Standards June 28, 1996, Country Department IV Europe and Central Asia Region, available at https://documents1.worldbank.org/curated/en/167591468742503268/pdf/multi-page.pdf

[13] The Republic of Belarus, December 1999, IMF Staff Country Report No. 66/143, available at https://www.imf.org/external/pubs/ft/scr/1999/cr99143.pdf

[14] There were three redenominations of Belarusian ruble: on 20 August 1994, it was redenominated at the rate of 10 old rubles to one new ruble, on 1 January 2000 - at a rate of 1,000 old rubles to one new ruble, and on 1 July 2016 – at the rate of 10,000 old rubles to one new ruble. Republic of Belarus: Staff Report, International Monetary Fund, Volume 2007: Issue 310, available at https://www.elibrary.imf.org/view/journals/002/2007/310/article-A002-en.xml

higher, greatly exceeded the national average. Yana's father left the family when Yana was approximately one year old, and he has not been in touch with her since that time. When Yana started school, Yana's mother also returned to school to obtain her high school diploma and to get professional training. Yana recalls doing her homework alongside with her mom doing her own school homework.

Yana's mother remarried when Yana was six years old. The family relocated to Kazakhstan four years later to be close to their new extended family. Yana's stepfather was employed as a mechanic, performing oil changes on vehicles. His parents lived with them for some time. In traditional Kazakh culture, a daughter-in-law (Kazakh: келін) is generally expected to show respect to her husband's parents and the husband by assuming significant responsibilities for their care. These responsibilities included preparing meals, maintaining the household, assisting elderly in-laws with daily activities, and attending to their needs.[15] Yana's stepfather's parents expected her to do so and were often verbally abusive towards Yana's mother and Yana. Yana's mother and Yana were expected to do all the

---

[15] *See* Europe-Asia Studies, Volume 77, 2025 - Issue 8, "I Can't Relax in My Own Home": Women Living in Multigenerational Households in Kazakhstan (2025), available at https://doi.org/10.1080/09668136.2025.2544718,

The traditional perception of the kelin has been described as:

The kelin has assumed the main housekeeping tasks (cleaning the house and raising kids), preparing food, taking care of her husband and his family, and most importantly, showing respect and pouring tea for family members and guests in the proper traditional manner, the latter being an important ritual of self-obedience traditionally ascribed only to the kelin.

household work. The family did not allow Yana walk outside without being accompanied by a male relative.

The family struggled financially. Their home was built from adobe (a mixture of clay, straw, and dung), a traditional Central Asian method for constructing affordable and warm housing. There was a river nearby that would always overflow during heavy rains. The trash that was thrown into the river over the winter by the upstream neighbors flooded the grounds and their home along with the sandy dirty water. Yana recalls countless hours cleaning the grounds from all that dirt, overgrown wood and animal carcasses.

Yana's childhood home environment was marked by domestic abuse and alcoholism that often accompanies reduced socioeconomic conditions.

### 2. Medical Issues

Yana Leonova is unwell. She has been diagnosed with a number of medical conditions: mastodynia, menstrual-ovarian cycle disorder, dysmenorrhea, high blood pressure, heart arrhythmia, osteochondrosis of the lumbosacral spine, low back pain syndrome associated with intervertebral disc disease of the lumbar spine with radiculopathy, obesity, metabolic syndrome, insulin resistance, Grade I adrenal insufficiency, adrenal fatigue syndrome, endocrinopathy, diffuse toxic

goiter, autoimmune thyroiditis hypertrophic form, iodine deficiency disorder, neurocirculatory dystonia, and mild myopia in both eyes.[16]

She requires specialized endocrinological and heart arrhythmia treatment and monitoring. Her former treating doctor in Russia has recently conducted a virtual medical interview and concluded that

> Given the severe, complex, multi-organ pathology—which requires constant monitoring and adjustment of treatment, and which could progress at any moment leading to irreversible consequences (such as adrenal crisis—a condition requiring emergency care—or retinal detachment)—I consider it impossible to keep the patient in isolation from society.[17]

Although the Bureau of Prisons provides medical care to inmates in their facilities, the care has been scrutinized for repeated failures.[18] In Alexandria detention facility, Ms. Leonova spent about a week in a medical unit because of her gastroenterological issues and intolerance of the prison food. Sending Ms. Leonova to a BOP facility could potentially cause her health to deteriorate and become life-threatening.

### 3. Mental Health Vulnerability

Due to the stressors associated with traumatic arrest and prolonged detention Ms. Leonova will need mental health care and strong support, neither of

---

[16] Ms. Leonova's translated medical records are available for in-camera review.

[17] Vartanova G.Zh. Medical Documentation Form No. 025/u dated October 6, 2026.

[18] *See e.g.,* Meg Anderson*, 1 in 4 inmate deaths happen in the same federal prison. Why?*, NPR September 23, 2023, available at *Many federal inmates don't get medical care they need. Some don't survive* : NPR.

which is readily available to incarcerated individuals. Due to lack of financial resources Ms. Leonova has not been able to receive a thorough mental health evaluation. "Prisons and jails are extremely violent places. People often experience traumatic verbal or physical assaults and dehumanization at the hands of correctional officers. And the various stressors in a carceral environment also increase the chances of violence between incarcerated people."[19]

During her detention at Alexandria facility, she was housed with a mentally ill inmate who was screamed and banged on the door days and nights. Yana could not sleep or focused on any task as the disturbance was so profound.

It should also be recognized that incarceration presents unique hardships for foreign nationals that go through the extradition process. Individuals incarcerated in a country that is not their own frequently encounter substantial language, cultural, and institutional barriers that complicate their ability to navigate daily life in a correctional setting, understand institutional rules and procedures, communicate effectively with staff, and access available services and programs.

---

[19] Katie Rose Quandt and Alexi Jones, *Research Roundup: Incarceration can cause lasting damage to mental health*, Prison Policy Initiative, May 13, 2021, available at https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.

These challenges have significant psychological consequences.[20] For Yana Leonova, detention in the United States is particularly burdensome. English is not her primary language, she is unfamiliar with American correctional institutions and cultural norms, and she has dietary needs and medical regimen that differ substantially from those typically accommodated in a detention setting. As a result, the conditions of confinement impose hardships on her that exceed those ordinarily experienced by a typical inmate.

### 4. Compliance with Pretrial Release

Compliance with pretrial release conditions is routinely weighed under the 18 USCS § 3553(a) factors to support a downward variance, this is analyzed alongside other mitigating factors like a lack of criminal history, personal trauma, or mental health conditions, rather than as a standalone credit for pre-sentence home detention.[21]

---

[20] *See* Myriam Vidal Valero in *U.S. Immigration Policy: Mental Health Impacts of Increased Detentions and Deportations*, published by the American Psychological Association, available at https://www.apa.org/monitor/2025/09/mental-health-immigration-enforcement,

> Given the existing trauma many immigrants already carry, detainees are vulnerable to developing chronic medical conditions, and the longer they spend in detention, the more likely they are to be at risk of mental health problems, including PTSD and suicide.

*See also* Arnell P, Forrester A. *Extradition and mental health: The need for multidisciplinary review and research*, Med Sci Law, 2021 Apr, available at https://pubmed.ncbi.nlm.nih.gov/33554757/.

[21] *See United States v. Janzad*, 2026 U.S. Dist. LEXIS 184760; *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).

Ms. Leonova's conduct during the year-long extradition proceedings in France and home detention in New Jersey demonstrates exemplary compliance. She was arrested upon arrival in France as a tourist through no act of evasion on her part. Ms. Leonova spent approximately six weeks in jail, after which the French court released her on home detention to reside with a host family. For the next year, she fully complied with all conditions: wearing an electronic bracelet, observing strict home confinement hours, and appearing for all court proceedings. Due to her perfect compliance, the French court even authorized some hours outside the residence.

Ms. Leonova was also fully cooperative with the authorities at the conclusion of her extradition proceedings. She respectably submitted herself to the arresting officers. She was respectful to the U.S. marshals while waiting long hours with them at the airport, she fully cooperated with the U.S. marshals during the flight to the United States and on her way to Alexandria Detention Center.

Since December 18, 2025, Ms. Leonova has been confined to a 1,012-square-foot attached home living space in New Jersey, except for limited approved absences for several church and attorney visits. Ms. Leonova also fully complied with the High Intensity Home Incarceration program in New Jersey. On May 20, 2026, the Court permitted Ms. Leonova two hour per day outdoor time within the limits of the residence homeowners' association for walks and physical activity. ECF 47. On July 14, 2026, the Court permitted Ms. Leonova to volunteer at the

local non-profit organizations. ECF 52. A local church provided transportation on several occasions, and Ms. Leonova contributed her labor and skills for the restoration of a historical church building and cemetery in South Jersey.

Ms. Leonova is a stable individual whose track record shows respect for the law enforcement personnel and full compliance with the orders of the French court and this Court. She respectfully requests the Court to take her conduct over the course of the extradition and this criminal case proceedings in evaluating the factors for a downward variance.

### 5. Consideration of Time Served on Home Detention for A Downward Variance

The defense respectfully requests the Court to consider the conditions and the time served on home detention in France and in New Jersey for a downward variance.

According to the Sentencing Guideline Manual, a sentencing court may depart if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. *See United States v. Linares-Sandoval*, 366 F. App'x 364, 368 (3d Cir. 2010),

> No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities... Accordingly, we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.

While "[t]he Guidelines preclude the use of home detention or confinement as an alternative to imprisonment where, as here, the recommended sentence is '15 months or more' ... **To be sure, a sentencing court can consider pretrial detention if it decides to vary from the Guidelines**." *United States v. Newkirk*, 174 F.4th 336, 347 (3d Cir. 2026) (emphasis added). But given that pretrial release is not as harsh as imprisonment, the a less than a day-to-day offset against time to be served in prison should be considered. *Id.*

The limitation imposed by 18 U.S.C. § 3585(b) on awarding credit for time served does not preclude a sentencing court from considering restrictive pretrial release conditions when determining whether a downward variance is warranted under 18 U.S.C. § 3553(a). *Newkirk*, 174 F.4th 336. There is a distinction between statutory credit for time served and the sentencing court's discretion to impose a sentence that is sufficient, but not greater than necessary.[22]

The conditions of home detention were always particularly restrictive for Ms. Leonova because she was in a foreign country, away from her family and friends. Her family had to raise funds to pay for her living expenses and accommodation. The funds were limited, the rooms that she rented for home detention were small and the least expensive that one could afford. The ankle

---

[22] *See, e.g., United States v. Janzad,* No. CR 23-0346 JB, 2026 U.S. Dist. LEXIS 184760, at *4 (D.N.M. Aug. 18, 2026) (considering demonstrated compliance with the pretrial release as one of the factors for a downward variance).

monitor often cut her skin because due to her medical conditions her legs became swollen each day by the nighttime. She was not only isolated by distance but also completely isolated from the society, not being able to understand cultural norms, not being able to converse with people, not being able to share her thoughts and feelings with any live person except her priest, attorney and custodians.

### 6. Deportable Alien Considerations

The Presentence report correctly notes that present law requires an alien convicted of a federal offense who is sentenced to imprisonment to serve the entire sentence (less statutory good time and time served) before deportation. The defendant's status as an alien precludes her from eligibility to participate in certain programs or from other considerations as an inmate in the U.S. Bureau of Prisons while serving the sentence for the instant offense. A downward departure is appropriate in this case because Ms. Leonova's status as a deportable alien is likely to cause fortuitous increase in the severity of confinement.

Additionally, the Court may consider that Ms. Leonova was brought to the United States via extradition proceedings; however, she would still have to be detained while undergoing the immigration court process to be deported. Such process would take many months before she is placed on a flight to Belorussia. This additional custodial time is also a form of punishment resulting from the offence.

### D. The Purpose of Sentencing Will be Accomplished with the Requested Sentence

The Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553 (a).

#### 1. The Requested Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess the need for the sentence imposed, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *Id*. A lengthy term of incarceration is not required in order for a sentence to reflect the seriousness of the offense. Even a sentence of probation "rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."[23]

The consequences have been immediate and severe: her life has been upended, and she has been incarcerated in a foreign country on the other side of the globe.

---

[23] *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (relying on *Gall v. United States*, 128 S. Ct. 586, 595 (2007)).

### 2. The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes

Under 18 U.S.C. §§ 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct…[and] to protect the public from further crimes of the defendant." Lengthy prison sentences do not mean the public is safe. A 2017 Vera Institute of Justice analysis shows that higher incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it also may dissuade people from committing future crimes out of fear of punishment (deterrence). In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs ….[24]

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect."[25] With respect to specific deterrence, research shows conclusively that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment,"

[24] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf.

[25] *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf.

that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."[26] Research has demonstrated that reductions to sentence length and time served do not harm public safety,[27] longer sentences do not reduce recidivism more than shorter sentences. [28]

Yana Leonova's life has been turned upside down, she faces the stigma of a conviction, and her aviation industry career is over. These weighty consequences serve as deterrence to future criminal conduct. Her life as she knew it is changed forever – she has already lost her livelihood and her reputation. She will not commit further crimes. In addition to this punishment, she does not pose a risk of recidivism; she is an otherwise law-abiding individual who "[did] an incredibly dumb thing" and "[is] not the type of defendant the guidelines section was designed to punish."[29]

With respect to the community at large, a sentence of time served, coupled with the losses she has suffered, will send a clear message that others who may consider engaging in similar conduct should take pause, re-evaluate their current

---

[26] *Id.*

[27] *Id.*; *see also* James Austin et al., *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016).

[28] *Id.*

[29] *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005).

state of diligence regarding compliance with export control laws, and consider the devastating consequences that will follow should they be prosecuted. The Department of Justice press releases already sent that message to the similar offenders.

Yana has never been, and is currently not, a threat or danger to the public. As already noted, this is Yana's very first contact with any criminal justice system. The absence of any criminal history is a valid reason for finding that the purposes of sentencing will be adequately served by a sentence outside the advisory Sentencing Guidelines.[30]

While the lack of criminal history demonstrates the uncharacteristic nature of his offense conduct, Yana's immediate acceptance of responsibility and excellent behavior, further demonstrate that additional incarceration is not warranted in this case. Incarceration will not provide greater public protection, as the public need not be protected from Yana in the first place. Indeed, to the contrary, nearly every one of the letters of support and his personal history attests that the public will be at a loss if Yana is sentenced to a term of incarceration.[31]

---

[30] *See, e.g., United States v. Huckins*, 529 F.3d 1312, 1318-19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Sentencing Guidelines range "even when the defendant has been placed into a criminal history category of I").

[31] *See Exhibits 8-21*, Letters from all over the world attesting to the Yana's law-abiding character and kindness.

### 3. The Requested Sentence Properly Reflects § 3553(a) Considerations and Would Not Create an Unwarranted Sentencing Disparity

A review of the sentences imposed in cases with offense conduct involving conspiracy to violate export control laws shows probation, home confinement, imprisonment, and a fine as available sentences. In the recent cases involving Russia-related sanctions, the courts routinely impose sentences below the Sentencing Guidelines range. A sentence of time served and supervised release is well within the Court's discretion and will not create a sentencing disparity among similarly situated defendants. In contrast, a sentence imposed within the Sentencing Guidelines here would create an unjust disparity.

## E. Public Policy Factors

A sentence of time served, followed by the Defendant's immediate lawful return to her home country, would not only satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a), but would also be consistent with important current public policy objectives on efficient enforcement of immigration laws, protection of American taxpayers, and responsible allocation of federal resources.

The White House has expressly identified the efficient enforcement of immigration laws and the removal of removable foreign nationals as significant federal priorities. It has likewise emphasized the importance of eliminating unnecessary federal expenditures and ensuring responsible stewardship of taxpayer resources. Congress has also recognized that removal of certain non-

violent foreign offenders before completion of imprisonment may serve the national interest.[32] These policy statements demonstrate that continued incarceration foreign nationals and the expenditure of U.S. administrative resources are not invariably necessary to advance federal interests.

The offence committed by Ms. Leonova does not involve violence, terrorism, drugs or arms. The smuggled products are aircraft parts, which direct export to Russia was perfectly legal prior to 2022. Based on aviation safety concerns, civil aircraft parts sanctions may be lifted sometime in the future. [33] For example, sanctions on exportation of diesel from Russia expeditiously were lifted a week ago based on emerging national interest. [34]

The defense does not suggest that foreign citizenship alone warrants leniency, nor does it minimize the seriousness of the offense or the importance of general deterrence. Rather, the question before the Court is whether additional

---

[32] *See, e.g.*, 8 U.S.C. § 1231(a)(4)(B).

[33] *See* Boeing and Rolls-Royce found to be lobbying against sanctions on Russia, Alexey Stepanov, Novaya Gazeta – Europe, May 12, 2025, available at https://krgrlsv5---app-b2ctx63wlq-lz.a.run.app/en/articles/2025/05/12/boeing-and-rolls-royce-found-to-be-lobbying-against-sanctions-on-russia-en-news.

*See also* Russia presses global aviation gathering to ease sanctions over safety concerns, Gleb Stolyarov and Allison Lampert, September 22, 2025, updated September 22, 2025, available at https://www.reuters.com/business/aerospace-defense/russia-asks-un-aviation-agency-icao-ease-sanctions-over-safety-concerns-2025-09-22.

[34] *See* OFAC General License No. 135 lifting sanctions "related to the sale, delivery, offloading, or importation, including importation into the United States, of diesel fuel of Russian Federation origin", available at https://ofac.treasury.gov/media/937216/download?inline.

incarceration is necessary to achieve the statutory purposes of sentencing in light of the punishment already endured and the Defendant's individual circumstances.

Under the circumstances of this case, the defense respectfully submits that it is not. A sentence of time served would constitute a just and proportionate judgement in this case that is consistent with 18 U.S.C. § 3553(a) factors.

October 14, 2026

*s/ Anna V. Brown, Esq.*

**BROWN LEGAL CONSULTING, LLC**
Anna V. Brown, Esq.
DDC Bar No. NJ061
10 Rittenhouse Rd.
Frenchtown, NJ 08825
Tel. (856) 357-4651
Fax. (856) 219-2038
anna@brownlegalconsulting.com
Attorney for Defendant Yana Leonova