**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No.: 24-cr-421 (LLA)** |
| **YANA LEONOVA** | : | |
| **(A/K/A YANA LIAVONAVA)** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S REPLY TO DEFENSE'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in response to the defendant Yana Leonova's sentencing memorandum (ECF No. 58). The government recommends that the Court impose a sentence of 37 months of imprisonment, followed by 36 months of supervised release, and a Sentencing Guidelines fine. A sentence of time-served—amounting to only three months of actual detention supplemented by two years of comparatively lenient pretrial home confinement—would fail to reflect the seriousness of this offense, the nature and circumstances of the defendant's conduct, and the importance of deterrence, particularly when significant national security interests are at stake. A minor role adjustment also is not applicable because Leonova was not substantially less culpable than her co-conspirators. A departure from the Sentencing Guidelines because of Leonova's status as a deportable alien also is not warranted, as discussed further below.

## I. A GUIDELINES SENTENCE IS NECESSARY AND APPROPRIATE

This case involves export control violations committed against the backdrop of Russia's ongoing war of aggression in Ukraine, at a time when U.S. national security policy relies on strict enforcement of export restrictions to prevent American technology, equipment, and dual-use items

from fueling Russian capabilities. Violations of these controls undermine U.S. national security objectives and support proponents of a hostile foreign power. The Russian aviation company, for which Leonova procured U.S. aviation parts, operated a private jet service that catered to Russian sanctioned individuals and oligarchs, providing transportation and logistical support to clients whose activities were restricted under U.S. sanctions law. Export controls are vital to disrupting the flow of U.S.-origin parts and technology to Russia, which empowers Russia amidst its war against Ukraine, and enforcing them rigorously through criminal prosecutions is necessary to deter those who would otherwise profit from undermining U.S. national security policy. After the war commenced, Leonova devised this unlawful procurement scheme with her co-conspirators, which ultimately resulted in dozens of critical items being shipped to Russia and millions of dollars paid in return. The nature and circumstances and seriousness of this offense support a sentence within the Guidelines range, pursuant to 18 U.S.C. § 3553(a).

As described in the government's sentencing memorandum, comparative sentences imposed in recent export control cases demonstrate that a sentence of 37 months is consistent with the national security harm, statutory sentencing purposes, and the seriousness of this offense. ECF No. 57 at 7-9. Courts around the country have imposed custodial terms of similar or greater length in cases involving unlawful transfers of U.S.-origin goods to Russia or other proscribed destinations and recipients, reflecting the judiciary's recognition that such crimes materially undermine U.S. foreign policy and security objectives. These comparative sentences make clear that a 37-month imprisonment term is proportionate, promotes deterrence, and aligns with national security-focused sentencing outcomes in analogous export control cases.

The defense's proposed time-served sentence would neither account for the defendant's deliberate and sustained role in procuring unlawful exports nor serve the deterrent and punitive

purposes, as mandated by 18 U.S.C. § 3553(a). The defense's assertions that prison is ineffective as a deterrent and that longer sentences do not reduce recidivism are inconsistent with Congress' mandate and the type of criminal conduct here. ECF No. 58 at 30-32. Under 18 U.S.C. § 3553(a)(2)(B), Congress requires courts to impose sentences "to afford adequate deterrence to criminal conduct." This statutory directive reflects a considered judgment that incarceration serves not only to punish and incapacitate but also to deter future wrongdoing. The Supreme Court also has been clear on the importance of deterrence in sentencing. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses."); *see also United States v. Flores-Gonzalez*, 86 F.4th 399, 410 (1st Cir. 2023) ("The Sentencing Commission recognizes that the need to deter constitutes an important consideration in calibrating the length of a sentence." (citing *Rita v. United States*, 551 U.S. 338, 347–49 (2007))).

A Guidelines sentence is particularly necessary to achieve deterrence in export control cases, where the unlawful transfer of U.S. equipment poses significant risks to national security. In this context, only a meaningful custodial sentence sends a clear message that violations of U.S. export control laws—particularly those that aid Russian sanctioned persons and proponents of Russia's war against Ukraine—will be met with serious consequences, thereby deterring those who might otherwise view such schemes as low-risk, high-reward ventures. The defense asserts that because these export restrictions were imposed in response to Russia's war of aggression, they may be lifted in the future, which thus should factor towards a more lenient sentence. ECF No. 58 at 34. The opposite is true. The government determined that this conduct poses a national security

threat, and significant criminal enforcement is necessary to disrupt effectively such schemes and deter actors from undermining U.S. export control regimes.

Deterrence also plays an important role for criminal offenses involving pecuniary gain. *See*, *e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (cleaned up)); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (same). Despite the defense's assertion that deterrence should be discounted, the clear mandate is for courts to consider both general and specific deterrence at sentencing.

Further, a downward variance based on Leonova's pretrial home confinement is unwarranted. The defense cites cases for its argument for a variance for pretrial home confinement. ECF No. 58 at 26-28. In *United States v. Newkirk*, the court did state that "a sentencing court can consider pretrial detention if it decides to vary from the Guidelines," but it cautioned that pretrial home confinement "conditions are hardly the equivalent of time in prison" and that "'a day-to-day offset against time to be served in prison' 'would be too lenient to represent the punishment that Congress intended.'" 174 F.4th 336, 347 (3d Cir. 2026) (quoting *United States v. Martin*, 363 F.3d 25, 39–40 (1st Cir. 2004), and citing *United States v. Little*, 123 F.4th 1360, 1371 (D.C. Cir. 2024)). The *Newkirk* court ultimately held that the district court's downward variance to about two weeks' imprisonment was substantively unreasonable. *Id.* Further, in *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001),[1] the court held that conditions of pre-sentence confinement could be severe

[1] The defense includes a block quotation at ECF No. 58 at 26 citing to *United States v. Linares-Sandoval*, 366 F. App'x 364, 368 (3d Cir. 2010), but that quotation is from *Carty*, 264 F.3d at 196. In *Linares-Sandoval*, the court held that a below-guidelines sentence was reasonable, but it did not discuss pretrial home detention and instead discussed the defendant's time and experience in a Guatemalan jail. 366 F. App'x at 368.

enough to serve as basis for downward departure from the Sentencing Guidelines—but that was based on the defendant being *incarcerated* in the Dominican Republic awaiting extradition. The defense's cited cases, therefore, do not support a significant variance or a sentence of time-served.

The facts also do not support a substantial variance based on Leonova's pretrial home confinement. During this confinement, Leonova spent one year living with family friends in France and another in her own apartment in New Jersey. She has had access to the phone and internet and has been able to communicate with her family and friends. While home confinement is a restraint, Leonova was not "completely isolated from the society" as claimed by the defense, ECF No. 58 at 28, and she could communicate with her family and friends. Such conditions do not approximate the severity of custodial detention. *See Dawson v. Scott*, 50 F.3d 884, 890 (11th Cir. 1995) ("Confinement to the comfort of one's own home is not the functional equivalent of incarceration in either a practical or a psychological sense." (cleaned up)).

Granting a substantial downward variance on this record would create unwarranted sentencing disparities by rewarding a defendant whose conditions were far less restrictive than defendants who endured actual pretrial detention. *See* 18 U.S.C. § 3553(a)(6) (directing courts to avoid unwarranted disparities).

Crediting home confinement time in this manner also risks circumventing the statutory scheme governing credit for time served, which is limited by 18 U.S.C. § 3585(b) to "official detention."

Further, recognizing pretrial home confinement as grounds for a sentence reduction would undermine the objectives of general deterrence set forth in 18 U.S.C. § 3553(a)(2)(B). A term of imprisonment conveys the seriousness of national security offenses and the consequences that they carry. Allowing defendants to convert comparatively comfortable living arrangements into

sentence reductions diminishes the deterrent and punitive value of federal custody. *See Musgrave*, 761 F.3d at 609 (excessive leniency in non-violent sentences can weaken general deterrence).

The defense also seeks a variance due to Leonova's heath conditions, ECF No. 58 at 21-24, but the Bureau of Prisons ("BOP") is equipped to provide inmates with appropriate medical care.[2] Inmates also can obtain mental health services while incarcerated. Because BOP can provide medical care, this does not constitute a valid basis for deviating from the applicable Guidelines range.

"A defendant's sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment." *Musgrave*, 761 F.3d at 608 (citing 18 U.S.C. § 3553(a)(2)). "[W]hen a district court varies downward on the basis of the collateral consequences of the defendant's prosecution and conviction, the defendant's sentence will not reflect the seriousness of the offense, nor will it provide just punishment." *Id.* (citation omitted) (also stating that such considerations "tend to support shorter sentences in cases with defendants from privileged backgrounds"). Based on the reasons above, the government submits that the necessary and appropriate sentence is a sentence within the Guidelines range.

## II. A MINOR ROLE ADJUSTMENT IS NOT APPLICABLE

As discussed in the government's sentencing memorandum (ECF No. 57 at 9-10), Leonova does not qualify for the two-point minor participant adjustment under U.S.S.G. § 3B1.2(b), as the PSR correctly noted. PSR ¶¶ 58, 116. In seeking this adjustment, the defense argues that because Leonova was an employee at the Russian aviation company, she "had no authority or discretion"

[2] Note, the PSR states that while Leonova was prescribed various medications in France, she is currently not taking any prescription medications. PSR ¶ 94. It also states that Leonova has never suffered from, or been treated for, any mental or emotional health problems. *Id.* ¶ 96. The defense states that "[d]ue to the stressors associated with traumatic arrest and prolonged detention Ms. Leonova will need mental health care and strong support," but the defense does not identify any diagnosis of mental health issues. ECF No. 58 at 22-23.

and "no personal stake in bringing the aircraft parts to Russia." ECF No. 58 at 12-13. The defense also claims that Leonova "was unsophisticated and lacked independent judgement" and was "under intense pressure to continue performing her duties." *Id.* To the contrary, Leonova chose to devise and participate in this transshipment procurement scheme, knowing that it was unlawful, and she worked closely with her co-conspirators in the United States and Armenia to implement the scheme. She had independent agency and chose to commit a crime.

Leonova also benefited from this criminal activity because she was able to maintain her job at the Russian aircraft company for her role in purchasing these goods. The defense suggests that the Guidelines provide for this two-point reduction for "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks" (ECF No. 58 at 11 (quoting U.S.S.G. § 3B1.2(b), comment. (n.3))); however, that is just an example. The list of factors that the Court should consider instead includes "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2(b), comment. (n.3(C)(v)). Leonova had a personal stake in the success of the criminal scheme and financially benefited from it in terms of ongoing employment, as well as potentially other financial and career benefits working in the Russian aviation industry or for sanctioned Russian persons.

Further, Leonova's educated background and professional autonomy, including moving from Kazakhstan to Russia to pursue a job in the aviation industry, further dispel any notion that she lacked sophistication or was coerced into participation. Her demonstrated ability to make consequential professional choices undermines any claim that she was a mere follower without agency. Leonova was not forced to work at this company, and she could have refused to procure aircraft parts unlawfully from the United States or quit. It is not an excuse that her employer may have pressured or supported her criminal conduct.

Leonova was not *substantially less culpable* than her co-conspirators and thus does not qualify for the minor role adjustment. *Id*., comment. (n.3(A)). Each co-conspirator played a unique and essential role in the conspiracy: the buyer in Russia (Leonova), the supplier in the United States (Co-Conspirator A), and the transhipper in Armenia (Co-Conspirator B). Leonova understood the scope and structure of this criminal activity and intentionally played an active role in the conspiracy. She exercised decision-making authority, including devising the transshipment scheme and submitting each procurement order. Leonova played a critical role in this scheme and does not qualify as a minor participant under U.S.S.C. § 3B1.2(b).

## III. A DEPARTURE FOR DEPORTABLE ALIEN IS NOT WARRANTED

A downward departure due to the defendant being a deportable alien is not warranted here, because the defense has not met its burden of showing that the defendant will face substantially more severe conditions of confinement due to this status. The defense claims that the "defendant's status as an alien precludes her from eligibility to participate in certain programs or from other considerations as an inmate in the U.S. Bureau of Prisons while serving the sentence for the instant offense." ECF No. 58 at 28. The defense, however, does not identify any early release benefits for which the defendant would otherwise be eligible if not for the defendant's status as a deportable alien. The defense also claims that the defendant will spend "many months" in immigration court proceedings before being deported, arguing that this constitutes "additional custodial time." *Id.* However, pursuant to the plea agreement, the defendant agreed to a stipulated judicial order of removal and consented to the immediate execution of such order upon completion of the sentence imposed in this case. ECF No. 49 at 10. The defense has not substantiated these claims to warrant a departure in this case. Moreover, as stated in the Sentencing Guidelines, any such consideration should be addressed as a variance instead of a departure. *See* U.S.S.G., Ch. 1, Pt. A, intro.

comment. (2025) (removing departures relating to specific personal characteristics from the Sentencing Guidelines and instructing judges instead to rely on variances).

The government acknowledges the D.C. Circuit's decision in *United States v. Smith*, 27 F.3d 649 (1994) (recognizing potential downward departure was potentially available because the Jamaican defendant would not be able to spend up to six months in home confinement at the end of his sentence), that permitted a sentencing court to make a *discretionary* downward departure based on the defendant's status as a removable alien. *See also* PSR ¶ 138. The defendant here is a removable alien who has agreed to a stipulated order of removal in this case, which means that she is to be deported after her sentence is completed in the United States. However, the government believes that the basis for a *Smith* departure may not exist for this matter because there is not a high degree of likelihood that the defendant will "face substantially more severe conditions due to [her] immigration status." Hearing Tr. 19:15-16, *United States v. Williams*, 25-CR-0322 (D.D.C. Feb. 24, 2026).

The *Smith* departure was predicated on treatment of a foreign person more harshly because of his deportable status. In *Smith*, the D.C. Circuit held that it was "permissible" to depart below a Guidelines range because of concerns that a deportable defendant might not be eligible for early release, halfway-house placement, or similar programs. 27 F.3d at 650–55. But this is discretionary not mandatory: "a downward departure *may* be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." *Id.* at 655 (emphasis added). Indeed, the D.C. Circuit clarified that it did "not mean to suggest that a departure is in order whenever a factor unrelated to a prisoner's just deserts may affect the severity of his confinement." *Id.* On the contrary, "the circumstances justifying a downward departure on account

of the deportable alien's severity of confinement may be quite rare." *Id.*; *see also id.* ("such departures will be 'highly infrequent'" (quoting U.S.S.G., Ch. 1, Pt. A, § 4(b))).

The defense also has failed to carry its burden of showing that the defendant will face substantially more severe conditions since Leonova may be eligible to serve most of her sentence of incarceration in Kazakhstan under the terms of the International Prisoner Transfer program, pursuant to 18 U.S.C. §§ 4100-4115, Justice Manual § 9-35, and 7 FAM §§ 480-483 (Foreign Affairs Manual).[3] She is a citizen of Belarus, which is not a participating country,[4] but she has had status in Kazakhstan and might be eligible for this program in Kazakhstan.[5] Under the terms of the program, the sentencing country (the United States) "loses jurisdiction over the prisoner's sentence, and violations of the terms or conditions of the original sentence, including supervised release, cannot be enforced even if the prisoner returns illegally to the United States after satisfying the sentence in the foreign country." Justice Manual § 9-35.014 (further recognizing that "it is possible for a prisoner to spend less time or more time in his home country because of differences in laws regarding applicable prison credits and the availability of different forms of conditional release").[6] Because the defense has not shown that Leonova's "status as a deportable non-citizen will necessarily lead to substantially worse conditions," it should not be an independent basis for a departure or variance. Hearing Tr. 20:8-10, *Williams*, 25-CR-0322 (D.D.C. Feb. 24, 2026).

---

[3] The government notes that Jamaica, the home country in the *Smith* case, was not a country authorized to participate in this program.

[4] *See* U.S. Dept. of Justice, List of Participating Countries/Governments, https://www.justice.gov/criminal/criminal-oia/list-participating-countriesgovernments.

[5] This is dependent on Kazakhstan determining that she qualifies based on her status and on both countries approving the transfer.

[6] The government understands that Kazakhstan has a system of conditional early release and/or parole, including pursuant to Article 72 of the Criminal Code of the Republic of Kazakhstan. *See* https://www.wipo.int/wipolex/en/legislation/details/19374.

## IV. CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 37 months of imprisonment, a fine, and 36 months of supervised release. Such a sentence will appropriately reflect the seriousness of the offense, the defendant's acceptance of responsibility, and the need to deter others while avoiding unwarranted disparities.

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:

*/s/ Emma Ellenrieder*
Emma Dinan Ellenrieder
Assistant United States Attorney
D.C. Bar No. 1015108
National Security Section
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2656
Emma.Ellenrieder2@usdoj.gov

JOHN EISENBERG
Assistant Attorney General for
National Security

/s/ *Sean R. Heiden*__________
Sean R. Heiden
Deputy Chief
D.C. Bar No. 1617636
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
(202) 514-8106
sean.heiden2@usdoj.gov